PEOPLE v BEYDOUN

Docket No. 280122. Submitted December 3, 2008, at Detroit. Decided
April 14, 2009, at 9:05 a.m.

The Wayne County Prosecuting Attorney charged Adnan Beydoun in
the 20th District Court with two counts of violating MCL
205.428(3) of the Tobacco Products Tax Act. The district court,
Mark J. Plawecki, J., bound the defendant over to the Wayne
Circuit Court for trial on both charges. The defendant moved to
suppress evidence of the tobacco products seized in an administra-
tive search and to dismiss the charges, arguing that the warrant-
less search violated his Fourth Amendment rights. The circuit
court, Helen E. Brown, J., granted the motions. The prosecution
appealed.

The Court of Appeals held:

1. While the Fourth Amendment prohibition of unreasonable
searches and seizures applies to administrative inspections of
private commercial property, an exemption exists for administra-
tive inspections of pervasively regulated industries.

2. When applying the "pervasively regulated industry" doc-
trine, a court should consider (1) the existence of express statutory
authorization for searches or seizures, (2) the importance of the
governmental interest at stake, (3) the pervasiveness and longev-
ity of regulation of the industry, (4) the inclusion in statutes and
regulations of reasonable limitations on searches, (5) the govern-
ment's need for flexibility in the time, scope, and frequency of
inspections in order to achieve reasonable levels of compliance, (6)
the degree of intrusion occasioned by a particular regulatory
search, and (7) the degree to which a business person impliedly
consented to warrantless searches as a condition of doing business,
so that the search does not infringe on reasonable expectations of
privacy.

3. Michigan's tobacco businesses fall within the parameters of
the pervasively regulated industry exception to the warrant re-
quirement. All seven factors weigh in favor of the state's need to
enforce the Tobacco Products Tax Act. The act has several
provisions expressly authorizing searches and seizures. Courts
have long and consistently recognized the strong or significant

governmental interest in revenue collection. The act has detailed definitions, licensing and stamping requirements, recordkeeping and document maintenance obligations, schedules of tax rates, civil and criminal penalties for violations, procedures concerning seized property, and a delineation of tobacco tax disbursements for various purposes, and administrative rules covering those matters exist as well. Statutes regulating and taxing tobacco products have been in effect for more than 50 years. The statutes and regulations limit searches to business hours and to particular records and products in order to ascertain compliance with the act. The search in this case was not excessive or unnecessary. Allowing unannounced searches conceivably fosters greater compliance with the act, particularly in light of the lack of significant incentives for those who violate the act or the beneficiaries of the violations to report those violations. Given the long history of comprehensive regulation of tobacco products and the defendant's familiarity with the licensing process and regulations, the defendant impliedly consented to warrantless searches as a condition of participating in the tobacco business. No warrant was required for inspecting the defendant's business and seizing the unstamped tobacco found there, and the circuit court erred by dismissing the charges.

4. The defendant consented to the subsequent warrantless search of his house and the seizure of the tobacco products found there. The defendant fully cooperated with the police officers and voluntarily gave them cases of tobacco he had placed in his basement. The defendant's consent to the search and seizure at his home was unequivocal, specific, and freely and intelligently given and thus did not violate his rights under the Fourth Amendment or Const 1963, art 1, § 11.

Reversed and remanded for reinstatement of the charges and further proceedings.

SEARCHES AND SEIZURES — ADMINISTRATIVE INSPECTIONS — PERVASIVELY REGU-
LATED INDUSTRIES — TOBACCO PRODUCTS TAX ACT.

The Fourth Amendment prohibition of unreasonable searches and seizures applies to administrative inspections of private commercial property, but an exemption exists for administrative inspections of pervasively regulated industries; when applying the "pervasively regulated industry" doctrine, a court should consider (1) the existence of express statutory authorization for searches or seizures, (2) the importance of the governmental interest at stake, (3) the pervasiveness and longevity of regulation of the industry, (4) the inclusion in statutes and regulations of reasonable limita-

tions on searches, (5) the government's need for flexibility in the time, scope, and frequency of inspections in order to achieve reasonable levels of compliance, (6) the degree of intrusion occasioned by a particular regulatory search, and (7) the degree to which a business person impliedly consented to warrantless searches as a condition of doing business, so that the search does not infringe on reasonable expectations of privacy.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Jessica L. Hodgson*, Assistant Attorney General, for the people.

*Richard M. Lustig, P.C.* (by *Richard M. Lustig*), for the defendant.

Before: BORRELLO, P.J., and DAVIS and GLEICHER, JJ.

GLEICHER, J. This appeal focuses on the validity of a warrantless administrative search of a business owned by defendant Adnan Eddi Beydoun. After the administrative search and a subsequent seizure of tobacco products, a district court bound defendant over for trial on two charges of violating the Tobacco Products Tax Act (TPTA), specifically MCL 205.428(3) (possessing, acquiring, transporting, or offering for sale in violation of the act 3,000 or more tobacco products with an aggregate wholesale price of $250 or more). Defendant moved to suppress evidence of the seized tobacco and dismiss the charges, arguing that the warrantless searches violated his Fourth Amendment rights. The circuit court granted defendant's motions, and the prosecution now appeals as of right. We reverse and remand.

I

At defendant's preliminary examination, state police detective Michael Foley testified that in 2005 he was

working as a specialist with the state police's tobacco tax team. Foley described the tax team's responsibilities as including the performance of administrative inspections to ascertain whether establishments possessed state-mandated licenses to sell tobacco, pre-licensing activities, and "check[ing] on . . . counterfeit tobacco products and tobacco products brought into the state legally and illegally." Foley further explained that "we would check for tobacco tax stamps [on cigarettes or] an OTP Stamp, which is other tobacco products stamp on cases," as mandated by Michigan's tobacco tax statutes.

Foley recounted that on September 23, 2005, he went to defendant's Dearborn Heights business, the Arabian Market at 26018 Ford Road, intending to conduct an administrative inspection after having received an anonymous tip concerning the presence of illegal tobacco products at the market. When Foley entered the market, defendant identified himself as the store owner, prompting Foley to "explain[] to him who I was and who I was with that we were there to conduct [an] administrative inspection." Foley requested "to see four months [sic] worth of invoices for all tobacco products on the premise[s]. . ., the tax ID of the store and any other licenses that he possessed." According to Foley, defendant gave him invoices for the tobacco in the market and "a sales tax license for the store" and told him that he possessed a federal tobacco-related license. But Foley recalled that with respect to a Michigan tobacco tax license necessary for possessing or selling tobacco in Michigan, defendant denied having one, although he averred that "he had recently applied for one."

Foley recalled that he reviewed the invoices defendant presented, intending to compare the listed tobacco products with those inside the Arabian Market. At least

one invoice identified the purchaser of some tobacco "from the Middle East" as Starco Import & Export, L.L.C., which defendant explained was "a business that he owns . . . that . . . runs out of the same building that we were at."[1] Foley related that he contacted the Department of Treasury and learned that the Arabian Market, Starco, and defendant did not hold Michigan tobacco tax licenses. When Foley inquired concerning the whereabouts of more than "two thousand cases of Molasses Tobacco that had been shipped to the United States" according to one invoice, defendant took Foley to a storeroom that contained more than 300 cases of molasses tobacco, which is considered "OTP" tobacco. Foley recounted defendant's explanation that he had sold some of the tobacco shown on the invoice. None of the cases of tobacco stored at the Arabian Market bore Michigan tobacco tax stamps.

Foley testified that he and other agents seized the 300 plus cases of tobacco, valued at $84 a case, because defendant unlawfully possessed the tobacco without a Michigan tobacco tax license and the required state tobacco tax stamps. Foley averred that he gave defendant "a notice of seizure and an inventory of everything that was seized," then placed the tobacco in police storage. Foley added that on October 20, 2005, a civil hearing occurred to examine the lawfulness of the Arabian Market tobacco seizure, that defendant disclosed at the hearing that the remaining number of about 2000 cases of tobacco listed on the molasses tobacco invoice "were at . . . a building that he owns" next door to the Arabian Market, and that defendant

---

[1] Foley's subsequent investigation revealed that Starco held a current federal license permitting it "to import tobacco." Starco had also filed an application, signed by defendant on September 6, 2005, with the Michigan Department of Treasury to obtain "a Tobacco Products Tax License."

and his counsel "agreed to turn it over to us at that time." Around noon on October 21, 2005, after defendant's counsel apprised Foley that the remaining tobacco was located at defendant's Dearborn Heights residence, Foley went there to retrieve the remaining cases of tobacco. Foley recounted that defendant "invited us in, . . . took us to his basement and showed us where the remainder of the product was," and "also showed us around the whole house to show that there was no other product anywhere else in the garage or any other bedrooms" and that the police "took out one thousand seven hundred and seventeen cases of Molasses Tobacco from his residence," also worth $84 a case. The district court bound defendant over on the two charged counts, reasoning that "[MCL] 205.428 seems pretty clear, he's got to have a license."

In the circuit court, defendant moved to quash the charges.[2] Defendant additionally moved for an evidentiary hearing on the constitutionality of the September 23, 2005, warrantless seizure of tobacco from the Arabian Market. Defendant argued that "the search of [his] premises was not for administrative purposes but actually was intended for criminal purposes and the administrative subterfuge used by the Michigan State Police was a violation of the Fourth Amendment." The prosecution responded that (1) "the TPTA and the product it seeks to regulate are part of a pervasively regulated industry," rendering valid the warrantless "administra-

---

[2] In this motion, defendant theorized that because he undisputedly possessed a federal license authorizing him to import and export tobacco products, and because Michigan's tobacco licensing statutes directly conflicted with the federal licensing scheme, "pursuant to the Supremacy Clause of the United States Constitution the Federal Licensing statute should apply based on the Interstate Commerce Clause which grants Congress exclusive power to regulate the channels of interstate commerce." Defendant has not raised this issue on appeal.

tive search of the Arabian Market," (2) the state police had probable cause supporting the search of the Arabian Market in light of the anonymous tip they received about a large quantity of "illegal contraband OTP," together with defendant's admissions at the market that strengthened the reliability of the anonymous tip, and (3) the state police lawfully seized the tobacco products from defendant's house on October 21, 2005, because (a) they had probable cause to believe they would find the tobacco products there after defendant admitted possessing additional cartons and (b) defendant consented to the police search of his home and the seizure of the additional "unstamped OTP cartons."

At a hearing in July 2007, Detective Foley and Sergeant Angela Fleming, another trooper who participated in the inspection of the Arabian Market on September 23, 2005, offered testimony largely mirroring Foley's description of events at defendant's preliminary examination while clarifying several points: no one obtained an administrative warrant or a search warrant supporting the administrative search, which occurred during the store's business hours, despite the lack of exigent circumstances; no one explained to defendant before questioning him at the Arabian Market the criminal consequences that potentially could arise from the search; and the troopers did not place defendant in custody but permitted him to conduct store business during the inspection, which took about three hours. Foley and Fleming did not believe that they needed any kind of warrant to conduct the inspection.

The circuit court issued a bench ruling, explaining that it would grant defendant's motions to suppress all the seized tobacco:

> Now, in these situations with an anonymous tip—I mean, [defense counsel] has indicated that this appears to

be a pretext. And I think that when you look at all the facts and circumstances here, the administrative inspection was clearly a pretext for a criminal case. There was an anonymous tip. This gave rise to probable cause for a warrant. No warrant was issued. Quite a few people arrived. They arrived after their usual business hours but during the business hours of the store. Again, that's part of the pretext. They began the search before all of the invoices were provided and all of the investigation was conducted in terms of questions of Mr. Beydoun.

Mr. Beydoun was never advised that there could be any criminal consequences here. And, clearly, from the licenses that he held and had applied for, Mr. Beydoun obviously had an intent to comply with the law, and may have made a mistake, and the price of that mistake has been that civil forfeiture.

At the very minimum, an administrative warrant could have been received based upon reasonable cause based upon the anonymous tip. But we cannot bootstrap the requirement under the Fourth Amendment for a search warrant based upon the consent to the civil inspection, or the hearing; nor can we bootstrap the requirements for a search warrant or an administrative warrant based upon Mr. Beydoun's compliance with the so-called administrative inspection which took place.

But I think that when you look at all of the facts and circumstances here—and I'm not by any means suggesting that the officers here had any kind of malicious intent. They may be mistaken. But the role of government is to remember, in part, that defendants are also people of the State of Michigan, and we all are entitled to the protections. At a very minimum, Mr. Beydoun should have been advised that there could be criminal consequences to this inspection. But the inspection, even in the testimony today, the officers were assuming, in their minds, that they were just doing civil inspections. And I frankly don't think they thought there would ever be criminal charges here. But now that there are, we have to look back on what they did, what they knew, and what they should have done.

> They knew, because of the anonymous tip, that they had enough for a warrant. And they certainly knew when they got there and did their quote, administrative inspection, that the product was there, and could have gotten a warrant at that point. There was absolutely no risk of flight, no risk of destruction of product. They had the ability to guard it and to get it. And they didn't. So the motion is granted.

In each circuit court file, the circuit court that same day entered form orders granting defendant's motion for "suppression of evidence" and separate orders dismissing the charges against him.

## II

### A. STANDARD OF REVIEW

The prosecution maintains that the circuit court erred by granting defendant's motions to suppress the seized tobacco and dismiss the charges against him because the searches that occurred had justification in exceptions to the general search warrant requirement. When reviewing a bindover decision, the following standards apply:

> A magistrate's ruling that alleged conduct falls within the scope of a criminal statute is a question of law reviewed [de novo] for error, and a decision to bind over a defendant is reviewed for abuse of discretion. In reviewing the district court's decision to bind over a defendant for trial, a circuit court must consider the entire record of the preliminary examination, and it may not substitute its judgment for that of the magistrate. Reversal is appropriate only if it appears on the record that the district court abused its discretion. . . . Similarly, this Court reviews the circuit court's decision de novo to determine whether the district court abused its discretion. [*People v Orzame*, 224 Mich App 551, 557; 570 NW2d 118 (1997) (citations omitted).]

This Court also considers de novo questions of constitutional law. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009).

B. GOVERNING LEGAL PRINCIPLES

"It is well settled that both the United States Constitution and the Michigan Constitution 'guarantee the right of persons to be secure against unreasonable searches and seizures.' " *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004) (citation omitted). "A search without a warrant is unreasonable per se and violates both the Michigan Constitution and the United States Constitution unless the search is shown to be within an exception to the general rule." *People v Barnes*, 146 Mich App 37, 40-41; 379 NW2d 464 (1985). "While it is well established that the Fourth Amendment's prohibition of unreasonable searches and seizures applies to administrative inspections of private commercial property, an exemption from the search warrant requirement exists for administrative inspections of closely regulated industries." *Gora v City of Ferndale*, 456 Mich 704, 715; 576 NW2d 141 (1998). Whether the exemption applies is primarily determined by the pervasiveness and regularity of the regulation and the effect of such regulation upon an owner's expectation of privacy. *Id.* at 715-716.

Our Supreme Court delineated the contours of the "pervasively regulated industry" doctrine in Michigan in *Tallman v Dep't of Natural Resources*, 421 Mich 585; 365 NW2d 724 (1984). After carefully surveying federal and sister state caselaw analyzing the pervasively regulated industry doctrine elsewhere, which our Supreme Court viewed as "persuasive," the Court summarized as follows the features of Michigan's pervasively regulated industry doctrine:

We conclude that conflicts arising under art 1, § 11 of the Michigan Constitution between the enforcement needs of governmental agencies and the privacy interests of regulated commercial actors should be resolved by balancing the following factors:

(1) the existence of express statutory authorization for search or seizure;

(2) the importance of the governmental interest at stake;

(3) the pervasiveness and longevity of industry regulation;

(4) the inclusion of reasonable limitations on searches in statutes and regulations;

(5) the government's need for flexibility in the time, scope, and frequency of inspections in order to achieve reasonable levels of compliance;

(6) the degree of intrusion occasioned by a particular regulatory search; and

(7) the degree to which a business person may be said to have impliedly consented to warrantless searches as a condition of doing business, so that the search does not infringe upon reasonable expectations of privacy. [*Id.* at 617-618.]

The Supreme Court described the seven-factor balancing test as "a rational approach" in attempting to address the "meaningful distinction between regulatory or administrative searches and those conducted for the purpose of discovering the fruits or instrumentalities of crime." *Id.* at 618. The Supreme Court then summarized some of the meaningful distinctions:

The administrative inspector must be equipped with investigatory techniques which differ from those available to peace officers because regulatory misconduct differs from criminal misconduct. Most administrative code violations occur in areas not readily subject to public oversight, and hence go unreported and must be sought out. Criminal

acts, on the other hand, are often committed in public places or directly involve a victim with a high incentive to report a loss or injury. Code enforcement generally involves repeated detections of numerous minor violations; enforcement of criminal statutes often requires extensive investigation of a single flagrantly illegal act. [*Id.* at 618-619.]

### C. ANALYSIS OF SEARCH AND SEIZURE AT ARABIAN MARKET

#### 1. FACTOR ONE

Applying the seven *Tallman* factors to the tobacco tax team's search and seizure at the Arabian Market on September 23, 2005, we observe with respect to the first factor that the TPTA contains several provisions expressly authorizing both the search and the seizure. In MCL 205.426, the Legislature imposed voluminous recordkeeping requirements on multiple tobacco-related actors and included the following provision authorizing inspection of records:

(5) All statements and other records required by this section shall be in a form prescribed by the department and shall be preserved for a period of 4 years and offered for inspection at any time upon oral or written demand by the department or its authorized agent by every wholesaler, secondary wholesaler, vending machine operator, unclassified acquirer, and retailer.

The TPTA section governing tobacco tax stamps and stamping requirements, MCL 205.426a, contains several relevant legislative grants of authority to the department or its agents:[3]

(5) The department or its authorized agents may inspect or conduct an inventory of a wholesaler's or unclassified

---

[3] Pursuant to MCL 205.428(9), "[a]t the request of the department or its duly authorized agent, the state police and all local police authorities shall enforce the provisions of this act."

acquirer's stock of cigarettes, tobacco products other than cigarettes, and stamps during regular business hours and inspect the related statements and other records required in [MCL 205.426].

(6) The department or its authorized agents may inspect the operations of a secondary wholesaler, vending machine operator, or retailer, or the contents of a specific vending machine, during regular business hours. This inspection shall include inspection of all statements and other records required by [MCL 205.426], of packages of cigarettes and tobacco products other than cigarettes, and of the contents of cartons and shipping or storage containers to ascertain that all individual packages of cigarettes have an affixed stamp of proper denomination as required by this act. This inspection may also verify that all the stamps were produced under the authority of the department.

(7) A person shall not prevent or hinder the department or its authorized agents from making a full inspection of any place or vending machine where cigarettes or tobacco products other than cigarettes subject to the tax under this act are sold or stored, or prevent or hinder the full inspection of invoices, books, records, or other papers required to be kept by this act.

The TPTA additionally contemplates seizure, in relevant part in MCL 205.429(1):

A tobacco product held, owned, possessed, transported, or in control of a person in violation of this act, and a vending machine, vehicle, and other tangible personal property containing a tobacco product in violation of this act and any related books and records are contraband and may be seized and confiscated by the department as provided in this section.

These provisions expressly and plainly show the Legislature's intent to invest the department and its agents, including state and local police, with search and seizure authority under the TPTA.

2. FACTOR TWO

With respect to the second *Tallman* factor, "the importance of the governmental interest at stake," *Tallman*, 421 Mich at 617, this Court has observed that the TPTA "is at its heart a revenue statute, designed to assure that tobacco taxes levied in support of Michigan schools are not evaded." *People v Nasir*, 255 Mich App 38, 42; 662 NW2d 29 (2003). Michigan courts have long and consistently recognized the strong or significant governmental interest in revenue collection. The Michigan Supreme Court restated the important nature of revenue collection in *Wikman v City of Novi*, 413 Mich 617; 322 NW2d 103 (1982), explaining that the

> "object of that law, as it is of this, is to enable the government to collect its revenues without delay. The obligations of the government must be met promptly, and it is better that the citizen should resort to his common-law remedies to secure his rights, so far as a mere payment of what he claims may be an illegal tax is concerned, than the government should be embarrassed in the collection of revenues necessary to defray its expenditures.
>
> " 'Courts have frequently remarked upon the impossibility of the government calculating with any certainty upon its revenues, if the collection of taxes was subject to be arrested in every instance in which a tax-payer or tax collector could make out *prima facie* a technical case for arresting such collection, and it is justly said to be much better to let the individual pay to the government the demands it makes upon him, and, if he considers them in whole or in part illegal, apply for the refunding of the money, with interest afterwards.' Cooley, Taxation (2d ed), p 762."

\* \* \*

The significant public interest underlying the collection of revenues by the government resulted in limitations upon

a taxpayer's ability to contest tax assessments and obtain refunds of general revenue taxes. [*Id.* at 626-627, quoting *Eddy v Lee Twp*, 73 Mich 123, 129-130; 40 NW 792 (1888).]

See also *Detroit v Nat'l Exposition Co*, 142 Mich App 539, 547; 370 NW2d 397 (1985) (holding that MCL 213.291 serves the "important governmental interest of revenue collection at a fairly insignificant risk to the private property owner"). The state thus undisputedly has a substantial and important interest in collecting the tax revenues generated under the TPTA.

### 3. FACTOR THREE

Regarding *Tallman* factor three, "the pervasiveness and longevity of industry regulation," *Tallman*, 421 Mich at 617, the TPTA can aptly be described as a pervasive group of tobacco product regulations. The TPTA, which is codified at MCL 205.421 through MCL 205.436, contains detailed definitions, licensing and stamping requirements, recordkeeping and document maintenance obligations, schedules of tax rates, civil and criminal penalties for violations of the TPTA, procedures governing seized property, and a delineation of tobacco tax disbursements for various purposes. Several administrative rules further govern tobacco products. Mich Admin Code, R 205.451 *et seq.* And statutory tobacco product regulation and taxation in Michigan constitutes a tradition extending back more than half a century. In 1947, our Legislature enacted a comprehensive and detailed act imposing regulations and levying taxes on cigarettes, 1947 PA 265, which became 1948 CL 205.501 *et seq.* Similar detailed cigarette tax acts remained in effect through subsequent compilations, 1970 CL 205.501 *et seq.* and 1979 CL 205.501 *et seq.*, until the Legislature repealed the cigarette tax act in favor of the TPTA. 1993 PA 327,

effective March 15, 1994. In summary, detailed and pervasive tobacco regulation and taxation have had a long history in our state.

### 4. FACTORS FOUR AND SIX

Considering *Tallman* factor four, "the inclusion of reasonable limitations on searches in statutes and regulations," *Tallman*, 421 Mich at 618, we note that the TPTA contains several relevant sections addressing the department's and its agents' authority to inspect and search. Pursuant to MCL 205.426(5),

> [a]ll statements and other records required by this section shall be in a form prescribed by the department and shall be preserved for a period of 4 years and *offered for inspection at any time upon oral or written demand by the department or its authorized agent* by every wholesaler, secondary wholesaler, vending machine operator, unclassified acquirer, and retailer. [Emphasis added.]

Although this subsection contemplates that various participants in cigarette distribution in Michigan must supply records "for inspection at any time upon oral or written demand by the department or its authorized agent," the records subject to inspection are limited to the records required under MCL 205.426.

The provisions that the prosecution relies on for justifying the search of the Arabian Market in this case include the following relevant subsections of MCL 205.426a:

> (5) *The department or its authorized agents may inspect or conduct an inventory* of a wholesaler's or unclassified acquirer's *stock of cigarettes, tobacco products other than cigarettes, and stamps during regular business hours and inspect the related statements and other records required in [MCL 205.426]*.

*(6) The department or its authorized agents may inspect the operations of a secondary wholesaler, vending machine operator, or retailer, or the contents of a specific vending machine, during regular business hours. This inspection shall include inspection of all statements and other records required by [MCL 205.426], of packages of cigarettes and tobacco products other than cigarettes, and of the contents of cartons and shipping or storage containers to ascertain that all individual packages of cigarettes have an affixed stamp of proper denomination as required by this act. This inspection may also verify that all the stamps were produced under the authority of the department. [Emphasis added.]*

As reflected in the clear and unambiguous language of MCL 205.426a(5) and (6), the Legislature inserted the significant limitation that searches of the various named tobacco dealers may occur only in the course of regular business hours. And MCL 205.426a(5) and (6) further limit potential inspections to the records mandated under MCL 205.426, cigarettes and other tobacco products, and tobacco stamps and, under subsection 6, inspections to determine whether "all individual packages of cigarettes have an affixed stamp of proper denomination as required by this act."

One more noteworthy section of the TPTA concerning searches and seizure is MCL 205.429(2):

*If an authorized inspector of the department or a police officer has reasonable cause to believe and does believe that a tobacco product is being acquired, possessed, transported, kept, sold, or offered for sale in violation of this act for which the penalty is a felony, the inspector or police officer may investigate or search the vehicle of transportation in which the tobacco product is believed to be located.* If a tobacco product is found in a vehicle searched under this subsection or in a place of business inspected under this act, the tobacco product, vending machine, vehicle, other than a vehicle owned or operated by a transportation company otherwise transporting tobacco products in com-

pliance with this act, or other tangible personal property containing those tobacco products and any books and records in possession of the person in control or possession of the tobacco product may be seized by the inspector or police officer and are subject to forfeiture as contraband as provided in this section. [Emphasis added.]

MCL 205.429(2) conditions a search on reasonable cause that a felony violation of the TPTA has occurred.

In summary, the TPTA imposes substantial limitations on searches performed by the department and its agents, primarily that the searches take place in the course of normal business hours and that the searches remain focused on TPTA-mandated records and various tobacco products to ascertain whether they comply with the TPTA.

Regarding related *Tallman* factor six, the available evidence in this case reflects that "the degree of intrusion occasioned by [the] particular regulatory search" did not qualify as excessive or unnecessary. *Tallman*, 421 Mich at 618. Several tax team members accompanied Detective Foley to the Arabian Market in the midafternoon of September 23, 2005, during the market's regular business hours. Shortly thereafter, defendant supplied Foley with his identification, tobacco license information, and other tobacco-related documentation, including invoices. Foley ascertained from the state of the documentation that neither defendant nor his corporate entity that purchased some molasses tobacco possessed a Michigan tobacco license, which he then confirmed by calling the Department of Treasury. He also confirmed that the company that sold Starco the tobacco did not have a Michigan tobacco license. With defendant's guidance, Foley and other agents entered a storeroom and observed that multiple cartons of molasses tobacco did not bear the Michigan tobacco tax stamp mandated by the TPTA, prompting them to

seize approximately 300 cartons of tobacco. Foley esti-
mated that the search and seizure took approximately
three hours, during which defendant and an assistant
continued operating the market. No indication exists
that the September 23, 2005, inspection or search
exceeded the reasonably circumscribed search authority
granted the tax team members by the TPTA.

### 5. FACTOR FIVE

Turning to *Tallman* factor five, "the government's
need for flexibility in the time, scope, and frequency of
inspections in order to achieve reasonable compliance,"
*Tallman*, 421 Mich at 618, we note that two prior deci-
sions of this Court offer helpful guidance. In *Barnes*, this
Court considered the propriety of a warrantless search
and seizure that took place at the defendant's automobile
salvage yard, which was subject to statutory regulation.
*Barnes*, 146 Mich App at 39-40. The Court carefully
applied the *Tallman* factors to reach its determination
concerning the validity of the search, noting with regard
to factor five that the

> government's need for flexibility in conducting searches
> without warrants is apparent. A person who knowingly
> buys or sells stolen automobile parts is not likely to
> complain to the police. A person who innocently buys
> stolen automobile parts would have no occasion to do so.
> Trafficking in stolen automobile parts is, to that extent, a
> victimless crime, the only victim being the owner of the
> property that was originally stolen. Stolen automobile
> parts are much less readily identifiable than the stolen
> automobiles themselves. . . . Further, we suspect that even
> the vast majority of automobile parts dealers who are not
> knowingly dealing in stolen parts might nevertheless be-
> come somewhat casual in their record keeping and pur-
> chasing practices if they are not exposed to the potential of
> a search without a warrant. [*Id.* at 46-47.]

This Court more recently discussed *Tallman* factor five in the context of the former Michigan Liquor Control Act, MCL 436.1 *et seq.*:

> The next factor is focused on the government's need for flexibility in the time, scope, and frequency of the inspections. This factor is necessarily related to the nature of the industry and the extent to which the industry is pervasively regulated. In the case of the liquor industry, the potential for violation is extremely high and the danger occasioned by certain violations may be severe. In order to offer incentive to licensed business owners to comply with the provisions of the Liquor Control Act, it is somewhat necessary to enforce the provisions under the fear of an unannounced search of the premises. Moreover, the nature of the violation in the case at hand is such that an announced search would arguably lead to destruction of the evidence and thereby frustrate the purpose of the regulatory scheme. [*People v Thomas*, 201 Mich App 111, 119-120; 505 NW2d 873 (1993).]

With this guidance in mind, we observe that the incentive for a violator of the TPTA, or the beneficiary of a TPTA violation, to report those violations appears *de minimis* at best, especially because only the state falls victim to the lost tobacco tax revenue that TPTA compliance would have generated. The easy transferability or disposability of cigarettes and other tobacco products also gives rise to the concern noted in *Thomas* "that an announced search would arguably lead to destruction of the evidence and thereby frustrate the purpose of the regulatory scheme." *Id.* at 120. And as this Court has also deemed relevant, the potential for an unannounced search or inspection conceivably would foster greater compliance with the TPTA's regulations by those engaged in the tobacco business. *Id.*; *Barnes*, 146 Mich App at 47. In conclusion, we find that the state has a legitimate and strong need for flexibility

in the time, scope, and frequency of inspections in order to achieve reasonable compliance with the TPTA.

### 6. FACTOR SEVEN

We lastly must address *Tallman* factor seven, "the degree to which a business person may be said to have impliedly consented to warrantless searches as a condition of doing business, so that the search does not infringe upon reasonable expectations of privacy." *Tallman*, 421 Mich at 618. Several details of this case lead us to conclude that defendant impliedly acceded to warrantless searches as a condition of participating in the tobacco business. As we observed earlier, comprehensive and pervasive tobacco regulation and taxation have a long statutory history in Michigan, which would tend to undercut the reasonableness of any notion that defendant should not have anticipated warrantless inspections of his business premises under the plain language of the TPTA authorizing such searches. *Barnes*, 146 Mich App at 47 (emphasizing that "[g]iven the long duration of comprehensive Michigan regulation of [the automobile salvage yard] business, defendant cannot claim any reasonable expectation of privacy regarding the search involved here"); see also *Thomas*, 201 Mich App at 121 (observing that "[g]iven the extensive regulation of the liquor industry and the decreased expectation of privacy in certain commercial property, we believe that defendants should have reasonably expected a search without a warrant to occur on the premises") (citation omitted). The TPTA additionally sets forth expressly that persons who purchase, possess, acquire for resale, or sell tobacco in Michigan must have a Michigan tobacco license, MCL 205.423(1). *People v Motor City Hosp & Surgical Supply, Inc*, 227 Mich App 209, 215; 575 NW2d 95 (1997) (noting "the deeply rooted rule that ignorance of the law or a mistake of law is no defense

to a criminal prosecution"). Furthermore, at the time of the warrantless search on September 23, 2005, defendant (1) had engaged in the sale of tobacco and possessed large quantities of molasses tobacco, (2) had founded Starco to import and export tobacco products, (3) held a federal license authorizing him to import tobacco, and (4) had submitted an application for a Michigan tobacco tax license. We conclude that defendant impliedly consented to warrantless searches as a condition of his participation in the tobacco business because Michigan has comprehensively regulated tobacco for decades, defendant had substantial familiarity with the tobacco licensing process and other tobacco regulations, and the plain and unambiguous language of the TPTA authorized the department and its agents to review tobacco-related documentation and inspect tobacco products.

### 7. CONCLUSION CONCERNING CONSTITUTIONAL VALIDITY OF ARABIAN MARKET SEARCH

Our examination of the *Tallman* factors, all of which weigh in favor of the state's need to enforce the TPTA, leads us to conclude that the state's interest in performing warrantless inspections and searches in the limited manners set forth in the TPTA outweighs the privacy expectations of those who engage in tobacco transactions in Michigan and that Michigan's tobacco businesses thus "fall[] within the parameters of the pervasively regulated industry exception to the warrant requirement." *Tallman*, 421 Mich at 630-631. Consequently, Detective Foley and his colleagues need not have secured any form of warrant before inspecting the Arabian Market on September 23, 2005, and seizing the unstamped tobacco found there in violation of the TPTA. The search and seizure at the Arabian Market

thus did not violate either the Fourth Amendment or Const 1963, art 1, § 11. The circuit court incorrectly applied the law in finding the search invalid.

Defendant offers no authority specifically supporting his assertion "that the search of the premises was not for administrative purposes but actually was intended for criminal purposes and the administrative subterfuge used by the Michigan State Police [thus] was a violation of the Fourth Amendment." Furthermore, defendant either miscomprehends or misrepresents the nature of the appeals in *Barnes* and *Thomas*. In both *Barnes* and *Thomas*, just as in this case, the defendants faced felony charges stemming from warrantless searches of places of business. *Barnes*, 146 Mich App at 39-40 (three counts of receiving and concealing stolen property worth more than $100, former MCL 750.535, which carried possible sentences of up to five years' imprisonment and a $2,500 fine);[4] *Thomas*, 201 Mich App at 114-115 (counts of possessing 50 grams or more but less than 225 grams of cocaine with intent to deliver it, MCL 333.7401(2)(a)(*iii*), which at that time required imprisonment of 10 to 20 years). This Court in both *Barnes* and *Thomas* held the warrantless searches constitutionally valid under the principles set forth in *Tallman* and upheld or reinstated the felony charges against the defendants. *Barnes*, 146 Mich App at 40-47; *Thomas*, 201 Mich App at 117-122. With respect to defendant's related suggestion that the administrative inspection was invalid because it amounted to a pretext for finding a criminal violation, we observe that the record contains no evidence giving rise to a reasonable inference that Foley and his colleagues searched the Arabian Market while in reality entertaining the subjec-

---

[4] These charges constituted felonies under MCL 750.535(1) before the Legislature's 1998 amendment of MCL 750.535 by 1998 PA 311.

tive intent to establish defendant's commission of a felony. The record simply reveals nothing to support that Foley and the other search participants arrived to inspect the Arabian Market with the "primary purpose . . . to detect evidence of ordinary criminal wrongdoing." *Indianapolis v Edmond*, 531 US 32, 38; 121 S Ct 447; 148 L Ed 2d 333 (2000).

In summary, the circuit court misapplied the law in reversing the district court's bindover determinations.

### III. VALIDITY OF LATER SEARCH OF DEFENDANT'S RESIDENCE

The subsequent warrantless search of defendant's home and the seizure of tobacco from the home were valid because defendant gave his consent. "A consent to search permits a search and seizure without a warrant when the consent is unequivocal, specific, and freely and intelligently given." *People v Galloway*, 259 Mich App 634, 648; 675 NW2d 883 (2003). At the civil administrative hearing, defendant, who was represented by counsel, revealed that he had possession of many additional cases of molasses tobacco. Defendant and his counsel agreed to turn the tobacco over to the department and made arrangements for the pickup of the tobacco to take place at defendant's home on October 21, 2005. No evidence suggests that the department or its agents coerced defendant at his home to admit having additional tobacco, to allow officers to search his home for the tobacco, or to surrender the tobacco. To the contrary, the available record establishes that defendant fully cooperated with Detective Foley and his colleagues when they arrived at his house, freely showed them around, and voluntarily gave them the nearly 2,000 cases of tobacco he had placed in his basement. We conclude that defendant freely, intelligently, unequivocally, and specifically consented to the

search and seizure that occurred at his home, which therefore did not violate either his Fourth Amendment rights or his rights under Const 1963, art 1, § 11.

Reversed and remanded for reinstatement of the charges and further proceedings consistent with this opinion. We do not retain jurisdiction.