*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v

DION LAMARR VAUGHN,

    Defendant-Appellee.

FOR PUBLICATION
December 1, 2022
9:45 a.m.

No. 356400
Wayne Circuit Court
LC No. 19-000788-01-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v

BRYAN DOUGLAS VAUGHN,

    Defendant-Appellee.

No. 356402
Wayne Circuit Court
LC No. 19-000788-02-FH

---

Before: RONAYNE KRAUSE, P.J., and JANSEN and MURRAY, JJ.

MURRAY, J.

In this consolidated appeal,[1] the prosecutor appeals as of right the orders dismissing charges against defendants, Dion Lamarr Vaughn and Bryan Douglas Vaughn, of four counts each of receiving and concealing a stolen motor vehicle, MCL 750.535(7), and one count each of operating a chop shop, MCL 750.535a(2). In both cases, the trial court dismissed the charges, with prejudice, on defendants' renewed motion to suppress evidence. We reverse and remand for further proceedings.

---

[1] *People v Vaughn*, unpublished order of the Court of Appeals, entered March 3, 2021 (Docket Nos. 356400; 356402).

## I. BACKGROUND

This appeal involves the warrantless entry and search of Gratiot Collision Service and Automotive Custom Paint Specialist on December 21, 2018. On that Friday afternoon at approximately 1:00 p.m., six Commercial Auto Theft Unit (CATS) officers of the Detroit Police Department went to Gratiot Collision to conduct a business inspection under the Motor Vehicle Service and Repair Act (MVSRA), MCL 257.1301 *et seq*. When the officers arrived, the door was locked and defendant Bryan Vaughn came to the door and told the officers the business was closed. When Sergeant Shaun Dunning showed Bryan his badge, Bryan opened the door and allowed the officers to come inside. Bryan told officers he was an employee of the shop and that his brother, defendant Dion Vaughn, was the owner. Dion was also present at the location and, according to Dunning, had just been spray-painting a vehicle when officers entered the premises.

Officers asked Dion to produce paperwork required to be maintained under the MVSRA, including the state business license, occupancy permit, major component parts book, and invoices for all cars on the premises. The only items Dion was able to produce were an expired state business license and an expired occupancy license. In other words, he produced no complying documents.

Dunning and other officers then went outside, where they encountered a gated and locked lot containing approximately 40 vehicles.[2] Bryan said he had a key to the locked area, and Dunning instructed him to unlock the gate. Officers peered into cars in the lot to find Vehicle Identification Numbers (VINs), which were visible through the driver-side window, and began running VINs through the Law Enforcement Information Network (LEIN) system to determine if any of the vehicles were stolen. After checking a number of vehicles, one of the officers found a 2006 Monte Carlo, located at the back of the lot, which was registered as stolen in LEIN. Based on this discovery, a search warrant was sought and obtained to search the premises. When executing the search warrant, officers found four other vehicles that were flagged as stolen. Defendants were each charged and bound over on four counts of receiving and concealing a stolen motor vehicle, MCL 750.535(7), and one count each of operating a chop shop, MCL 750.535a(2).

Dion's attorney filed, on behalf of both defendants, a motion to suppress evidence. With respect to that motion, defendants argued the evidence seized by police during the search of Gratiot Collision should be suppressed because the officers lacked probable cause of wrongdoing to search the locked and gated lot, and absent probable cause, the warrantless search was improper and in violation of defendants' rights under the Michigan and United States Constitutions. US Const, Am IV; Const 1963, art 1, § 11.

The trial court held an evidentiary hearing on the motion, in which the trial court heard testimony from Officer Burke, who prepared the search warrant, and defendants. The trial court also had available to it the preliminary exam transcript, where several other officers testified to the inspection and subsequent search executed after obtaining the search warrant. In closing, defendants argued that the officers lacked the authority to enter the locked and gated lot under the guise of a business inspection. Defendants also argued that officers only came to inspect Gratiot

---

[2] Also on the premises were major vehicle parts, such as engines, hoods, and doors.

Collision because of a "hunch" by Dunning that stolen property might be on-site; officers had no probable cause or reasonable suspicion that Gratiot Collision would possess stolen vehicles or parts. Defendants also noted that the shop was not "up and running in the normal course of business[,]" as required by statute, because defendants testified the shop was closed when officers arrived. According to defendants, when officers discovered Dion had not kept appropriate documents and licenses on site, a civil infraction should have been issued, and the criminal investigation involving the search of the gated lot was improper.

The prosecution argued in closing that consent was not required for the officers to search the business under the authority granted by statute, and the warrant challenged by defendants, and obtained after the stolen Monte Carlo was discovered, was proper on its face. The trial court, Judge Bridget M. Hathaway presiding, denied defendants' motion to suppress the evidence, concluding that officers were entitled by statute to conduct an unannounced inspection of the premises of Gratiot Collision, and officers acted reasonably in searching the lot when defendants could produce no required records.

Although the trial was scheduled to begin in September 2019, the case was instead administratively transferred to Judge Tracey E. Green. Defendants then moved for reconsideration of their motions to suppress, arguing that the United States Court of Appeals for the Ninth Circuit, in *United States v Grey*, 959 F3d 1166 (CA 9, 2020), had recently affirmed a district court's grant of a motion to suppress, holding that the execution of an administrative warrant violated the Fourth Amendment because it was used as a pretext to gather evidence to support a criminal investigation. Under *Grey*, defendants argued, the warrantless search was improper and could not be considered an administrative search.[3] The prosecution did not file a response. At the hearing, defendants also argued that (1) the Detroit Police had no authority to conduct the business inspection under the MVSRA, which requires an investigator from the Secretary of State to be present, and (2) the scope of the MVSRA was limited to a search for papers and documentation, and the officers exceeded that scope by searching a gated lot where they admit there were no documents to be found. The prosecution responded at the hearing that *Grey* was not binding and should not be considered instructive, and because Gratiot Collision's paperwork was not in order, the officers had sufficient suspicion of criminal activity for a warrantless search of the gated lot.

The trial court granted defendants' motion, concluding that the search exceeded the scope of the MVSRA, which only authorized officers to inspect "the premises, parts records, and parts inventories of a facility," and of MCL 257.1318, which narrows the scope to business records. Because the officers entered the gated lot in search of criminal activity, not business records, the search of the lot was improper. The trial court entered orders dismissing all charges against defendants with prejudice.

## II. STANDARDS OF REVIEW

"In order to properly preserve an issue for appeal, a [party] must raise objections at a time when the trial court has an opportunity to correct the error . . . ." *People v Pipes*, 475 Mich 267,

---

[3] Curiously, *Grey*—which is not binding authority—is not cited by either defendant on appeal, and the case did not address administrative searches of a pervasively regulated business.

277; 715 NW2d 290 (2006) (quotation marks omitted). Whether the warrantless search was unlawful as a violation of defendants' Fourth Amendment protections was argued extensively in the trial court and is preserved for appellate review.

Findings of fact made after a suppression hearing are reviewed for clear error, while the ultimate decision on a motion to suppress is reviewed de novo. *People v Rodriguez*, 327 Mich App 573, 583; 935 NW2d 51 (2019). " 'A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that the trial court made a mistake.' " *Id.*, quoting *People v Dillon*, 296 Mich App 506, 508; 822 NW2d 611 (2012).

The interpretation of a statute or court rule is a question of law that we review de novo. *People v Olney* (*On Remand*), 333 Mich App 575, 580; 963 NW2d 383 (2020); *People v Clement*, 254 Mich App 387, 389-390; 657 NW2d 172 (2002). "The goal when interpreting statutes is to give effect to legislative intent by examining the plain language of the words of the statute." *Olney*, at 581. Unambiguous language in a statute must be enforced as written. *Id.* These same rules apply to the interpretation of the court rules. *Ligons v Crittenton Hosp*, 490 Mich 61, 70; 803 NW2d 271 (2011).

III. LAW AND ANALYSIS

The prosecution contends that the trial court erred when it granted defendants' renewed motion to suppress evidence because repair shops like Gratiot Collision are closely regulated, and the MVSRA is an administrative statute permitting the warrantless inspection of the premises, including the inspection of the gated and locked lot. To resolve this argument, we must consider well-established constitutional principles regarding searches of heavily regulated businesses, as well as those portions of the MVSRA that authorize inspections.

A. CONSTITUTIONAL PRINCIPLES GOVERNING SEARCHES OF PERVASIVELY REGULATED BUSINESSES

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *Rodriguez*, 327 Mich App at 583, quoting *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000), citing US Const, Am IV; Const 1963, art 1, § 11. "The Michigan Constitution in this regard is generally construed to provide the same protection as the Fourth Amendment of the United States Constitution." *People v Chowdhury*, 285 Mich App 509, 516; 775 NW2d 845 (2009) (citations omitted).

Generally, searches conducted absent a warrant are unreasonable per se, and "when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *Id.*, quoting *People v Dagwan*, 269 Mich App 338, 342; 711 NW2d 386 (2005). See also *Rodriguez*, 327 Mich App at 583. The Fourth Amendment's "prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes." *New York v Burger*, 482 US 691, 699; 107 S Ct 2636; 96 L Ed 2d 601 (1987). "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *Id.* at 700, citing *Donovan v Dewey*, 452 US 594, 598; 101 S Ct 2534; 69 L Ed 2d 262 (1981).

As *Donovan* and later courts recognized, a business owner's expectation of privacy "exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes." *Burger*, 482 US at 700. However, "[t]his expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." *Id.* Indeed, as discussed below, "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Marshall v Barlow's, Inc*, 436 US 307, 313; 98 S Ct 1816; 56 L Ed 2d 305 (1978) (citation omitted). The *Donovan* court explained the diminished expectation of privacy recognized in commercial property owners:

> [U]nlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment. The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections. [*Donovan*, 452 US at 598-599 (footnotes and citations omitted).]

As noted, there are a number of exceptions to the fundamental rule that warrantless searches are unreasonable. *Arizona v Gant*, 556 US 332, 338; 129 S Ct 1710; 173 L Ed 2d 485 (2009). "In order to show that a search was in compliance with the Fourth Amendment, the police must show either that they had a warrant or that their conduct fell within one of the narrow, specific exceptions to the warrant requirement." *People v Kazmierczak*, 461 Mich at 418. The exception to the warrant requirement that has been carved out for pervasively regulated industries has been denoted as either the "*Colonnade-Biswell* doctrine"[4] or the "pervasively regulated industry" exception to the warrant requirement, *People v Barnes*, 146 Mich App 37, 41; 379 NW2d 464 (1985), and was first adopted in Michigan in *Tallman v Dep't of Natural Resources*, 421 Mich 585; 365 NW2d 724 (1984). No matter the nomenclature used, the exception is founded upon the legal recognition that owners of pervasively regulated businesses have a reduced expectation of privacy:

> Whether the exemption applies is primarily determined by ' "the pervasiveness and regularity of the . . . regulation" and the effect of such regulation upon an owner's expectation of privacy.' *New York v Burger*, 482 US 691, 701; 107 S Ct 2636, 2643; 96 L Ed 2d 601 (1987). When a person chooses to engage in a 'pervasively regulated business . . . he does so with the knowledge that his business . . . will be subject to effective inspection.' [*United States v*] *Biswell*, *supra* [406 US 311,] at 316; 92 S Ct [1593,] 1596; [32 L Ed 2d 87 (1972)]. In part, the justification for this is that, unlike under general inspection schemes, the person in the pervasively regulated business 'is not left to wonder about the purposes of the inspector or the

---

[4] Named after *Colonnade Corp v United States*, 397 US 72; 90 S Ct 774; 25 L Ed 2d 60 (1970) and *United States v Biswell*, 406 US 311; 92 S Ct 1593; 32 L Ed 2d 87 (1972).

limits of his task' as long as the regulations provide notice of and implicitly restrict the scope of the inspection to those areas of the business that must be examined to enforce the regulations. [*Gora v Ferndale*, 456 Mich 704, 715-716; 576 NW2d 141 (1998).]

To assist in determining whether a particular business is so pervasively regulated that administrative warrantless searches can be performed, and whether the search itself was reasonable, the *Tallman* Court adopted seven factors for courts to consider:

(1) the existence of express statutory authorization for search or seizure;

(2) the importance of the governmental interest at stake;

(3) the pervasiveness and longevity of industry regulation;

(4) the inclusion of reasonable limitations on searches in statutes and regulations;

(5) the government's need for flexibility in the time, scope and frequency of inspections in order to achieve reasonable levels of compliance;

(6) the degree of intrusion occasioned by a particular regulatory search; and

(7) the degree to which a business person may be said to have impliedly consented to warrantless searches as a condition of doing business, so that the search does not infringe upon reasonable expectations of privacy. [*Tallman*, 421 Mich at 617-618 (citations omitted).]

Using factors that are "substantially similar" to those adopted in *Tallman*, *People v Thomas*, 201 Mich App 111, 117; 505 NW2d 873 (1993), the US Supreme Court has to date held that this narrow warrant exception applies to four closely regulated industries: (1) liquor sales (*Colonnade*); (2) gun sales (*Biswell*); (3) mining (*Donovan*); and (4) automobile junkyards (*Burger*).[5]  Although the exception, like all exceptions to the warrant requirement, is a narrow one, our courts have likewise recognized several additional businesses as pervasively regulated industries for which reasonable warrantless inspections do not offend the state or federal constitutions: commercial fishing (*Tallman*), massage parlors (*Gora*), salvage yards (*Barnes*), liquor establishments (*Thomas*) and tobacco dealers (*Beydoun*[6]).  We now add vehicle repair shops to that list.[7]

---

[5] The United States Court of Appeals for the Sixth Circuit has held that pharmacies, sand and gravel operators, and precious metal operations are subject to the pervasively regulated business warrant exception.  See *Marshall v Nolichuckey Sand Co*, 606 F2d 693, 696 (CA 6, 1979), *United States v Acklen*, 690 F2d 70, 75 (CA 6, 1982), and *Liberty Coins, LLC v Goodman*, 880 F3d 274, 285 (CA 6, 2018).

[6] *People v Beydoun*, 283 Mich App 314; 770 NW2d 54 (2009).

[7] Our Court, as well as the United States District Court for the Eastern District of Michigan, have concluded that vehicle repair shops are pervasively regulated businesses and subject to reasonable

Gratiot Collision, as a motor vehicle repair shop, is a "closely regulated" industry for the purposes of Fourth Amendment protections. *Burger*, 482 US at 700 (defining a "closely-regulated" industry as one with "such a history of government oversight that no reasonable expectation of privacy could exist . . . .") (quotation marks and citations omitted). Our conclusion in *Barnes*[8] that vehicle junkyards are a pervasively regulated industry for purposes of the administrative warrant exception applies with equal force to vehicle repair shops. Globally speaking, there can be no doubt that vehicle repair shops share characteristics with the other closely-regulated industries which our courts have held can be subjected to warrantless administrative searches. But the operations of vehicle junkyards and vehicle repair shops, both of which contain full and partial vehicles on their premises, as well as many individual car parts, and both of which have the capacity for engaging in the sale or use of stolen vehicles or parts, are uniquely analogous to one another.

In consideration of *Barnes* and the seven *Tallman* factors, we readily conclude that police could perform a warrantless search of Gratiot Collision, a business that is pervasively regulated by the state, without offending either the state or federal constitutions.[9] With respect to the first factor, MCL 257.1317(1) instructs that a facility owner needs to ensure that the facility is open to inspections during regular business hours and that the administrator and other law enforcement officials can make periodic unannounced inspections of, amongst other things, the premises of the facility:

> The owner of a facility that is registered or is required to register under this act shall ensure that the facility is open to inspection by the administrator and other law enforcement officials during reasonable business hours. During reasonable business hours, the administrator and other law enforcement officials may make

warrantless administrative searches. See *People v Csernal*, unpublished per curiam opinion of the Court of Appeals, issued July 14, 2000 (Docket No. 205832) and *Drakes Collision, Inc v Auto Club Group Ins Co*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued November 30, 2020 (Docket No. 19-13517). Being either unpublished or not from our state appellate courts, neither decision is precedential.

[8] "[C]ases decided [by the Court of Appeals] before November 1, 1990, are not binding precedent," *Redmond v Heller*, 332 Mich App 415, 431 n 7; 957 NW2d 357 (2020) (quotation marks and citation omitted); MCR 7.215(J)(1), in the sense that they do not have to be followed even if the Court concludes the prior case was wrongly decided, as we must with post-November 1990 cases. However, pre-November 1990 decisions are still binding under stare decisis. MCR 7.215(C)(2).

[9] Although the tests articulated by the Michigan and US Supreme Courts are somewhat different, they essentially cover the same concerns and case law from the federal courts on this issue is considered persuasive. See *Gora*, 456 Mich at 715 n 10 ("Michigan has adopted a 'pervasively regulated industry' exception to art 1, § 11's warrant requirement that is essentially the same as the federal exception.") and *Barnes*, 146 Mich App at 42 ("The [*Tallman*] Court further noted that the seven Michigan factors differ only slightly from the factors commonly applied in the federal courts. Federal precedent is therefore useful."). Application of the seven *Tallman* factors allow a court to determine both whether the industry is pervasively regulated and whether the warrantless search authorized by the statute was reasonable. *Beydoun*, 283 Mich App at 335.

periodic unannounced inspections of the premises, parts records, and parts inventories of a facility.

As we said in *Barnes*, 146 Mich App at 42, "[t]he statute quoted above literally provides only for inspection, but any inspection necessarily implies a search and, by reasonable interpretation of legislative intent, a seizure." We, therefore, conclude that there is express statutory authorization to conduct unannounced searches of the premises, parts records and parts inventories of vehicle repair shops.

The second *Tallman* factor is "the importance of the governmental interest at stake." *Id*. at 41. We have previously recognized the dual governmental purpose of the MVSRA—to regulate the practice of servicing and repairing vehicles and to proscribe deceptive practices in light of prior gross abuses within the industry. See *Anaya v Betten Chevrolet*, 330 Mich App 210, 217; 946 NW2d 560 (2019) and *Auto Serv Councils of Mich v Secretary of State*, 82 Mich App 574, 596; 267 NW2d 698 (1978). Suffice it to say that consumer protection and combatting deceptive business practices in an industry where previous abuses have occurred are important governmental interests. See *Barnes*, 146 Mich App at 42 ("Further, it is a matter of common knowledge that automobile theft and the stripping of stolen automobiles to salvage parts are significant national problems which deserve significant governmental attention") and *People v Beydoun*, 283 Mich App 314, 333-334; 770 NW2d 54 (2009).

Turning our focus on the third factor, the "pervasiveness and longevity of industry regulation," *Barnes*, 146 Mich App at 41, there is little dispute that the vehicle repair industry is, and has been, pervasively regulated for over four decades.[10] The MVSRA was enacted in 1974, and since then has been repeatedly amended to address ongoing concerns and changes in the industry. The act itself contains multiple sections providing oversight on many facets of vehicle repair shops, including how to register, what records must be maintained and for how long, provisions regarding lost documents, renewing registrations and licenses, the rights of customers to return certain items, unannounced inspections, posting of certain consumer rights, a plethora of fees, misdemeanor penalties for violations of the act, and administrative procedures for addressing

---

[10] Of course, some might say that with the growth of state and federal regulations, *all* businesses are pervasively regulated. *Kisor v Wilkie*, __ US __, __; 139 S Ct 2400, 2446-2447; 204 L Ed 2d 841 (2019) (Gorsuch, J., concurring) ("Even 20 years later, when the Court began reviving the *Seminole Rock* [*Bowles v Seminole Rock & Sand Co*, 325 US 410; 65 S Ct 1215; 89 L Ed 1700 (1945)] dictum and turning it into a new deference doctrine, it was not yet apparent how pervasive the administrative state would become in the lives of ordinary Americans. Now, in the 21st century, '[t]he administrative state wields vast power and touches almost every aspect of daily life.' Among other things, it produces ' "reams of regulations" '—so many that they dwarf the statutes enacted by Congress. As of 2018, the Code of Federal Regulations filled 242 volumes and was about 185,000 pages long, almost quadruple the length of the most recent edition of the U. S. Code. And agencies add thousands more pages of regulations every year.") (citations omitted). Not surprisingly, the narrow pervasively regulated business exception to the warrant requirement is not nearly that broad. *Marshall*, 436 US at 313-314 (rejecting the argument that all businesses engaged in interstate commerce fall within the exception).

violations of the act. See MCL 257.1314 through MCL 257.1333.[11] These statutory rules have been in place in one form or another for decades and continue to be amended, providing more detail with respect to the requirements placed on these businesses.

The fourth factor requires focus on whether the statute contains reasonable limitations on searches. The MVSRA does. Specifically, the act informs owners of vehicle repair facilities that the administrator and other law enforcement officers will make unannounced inspections. MCL 257.1317. It also informs facility owners on how to comply with the statute's various requirements, including the records that must be available for an unannounced inspection. See MCL 257.1318. Additionally, although these inspections can be unannounced, there are specific limitations placed on this authority, including that the inspections take place during "reasonable business hours" and are restricted to the "premises, parts records, and parts inventories of a facility." MCL 257.1317(1). Thus, "the 'time, place, and scope' of the inspection is limited . . . to place appropriate restraints upon the discretion of the inspecting officers." *Burger*, 482 US at 711 (citation omitted). On the other hand, by permitting unannounced inspections, the act provides the state with the flexibility needed to achieve reasonable compliance with statutory mandates. See *Barnes*, 146 Mich App at 46-47 (noting that warrantless searches allow the state to discover both businesses engaging in illegal conduct that might not otherwise be reported by unsuspecting vehicle owners and those that simply fail to maintain the detailed record keeping mandated by statute). These conclusions satisfy both the fourth and fifth *Tallman* factors.

Under the sixth *Tallman* factor, we must consider the "degree of intrusion occasioned by a particular regulatory search." *Id*. at 41. Here, as in *Barnes*, we hold that the search conducted at Gratiot Collision "was not particularly intrusive." For one, it occurred on a Friday afternoon at approximately 1:00 pm. The owner and his employee were present at the business, and the police identified themselves and asked to inspect the statutory records. Although defendants argue—and the trial court held—that the business was closed for the day, there was no evidence of what the "posted or advertised" hours of the facility were, MCL 257.1317(3). And in the absence of such evidence, it remained undisputed that the search occurred in the afternoon of a day during the traditional work week, it was not a holiday, and both men were present at the location, with at least one performing some work. These circumstances are consistent with the definition of "reasonable business hours" contained in MCL 257.1317(3), as that phrase is defined to "include" "any posted or advertised business hours of a facility." Thus, the posted or adopted hours are not the sole determiner of what constitutes reasonable business hours. See *Christopher v SmithKline Beecham Corp*, 567 US 142, 162; 132 S Ct 2156; 183 L Ed 2d 153 (2012) ("[T]he definition is introduced with the verb 'includes' instead of 'means.' This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive."), *Burgess*

---

[11] A facility must also maintain a "police book," which contains:

"[T]he record of a sale, purchase, or acquisition of a major component part to a police book described in [the Michigan Vehicle Code]. A facility shall make its police book and its records of vehicle part sales, purchases, or acquisitions immediately available for inspection by the administrator and other law enforcement officials if a request for inspection is made." [MCL 257.1318(4).]

*v United States*, 553 US 124, 131, n 3; 128 S Ct 1572; 170 L Ed 2d 478 (2008) (" '[a] term whose statutory definition declares what it "includes" is more susceptible to extension of meaning . . . than where . . . the definition declares what a term "means" ' " ), and *United States v Howard*, 742 F3d 1334, 1348 (CA 11, 2014) ("The items that follow each use of the word 'includes' in the statute are non-exhaustive examples. . . .") (citation omitted). And, to say that Bryan's statement that the shop was closed foreclosed the unannounced inspection made in the middle of a work day, when the owner and employee were present, would render the provision allowing unannounced inspections to be a virtual nullity.

Based upon established case law and the clear statutory provisions of the MVSRA, we quickly dispatch with the question of whether an owner of a vehicle repair shop "may be said to have impliedly consented to warrantless searches as a condition of doing business." *Barnes*, 146 Mich App at 41. We again turn to *Barnes* for the conclusion that Dion impliedly consented to the search in light of his participation in the regulated field:

> We conclude that defendant impliedly consented to searches without warrants. He chose to enter the automobile parts business. Although defendant's salvage yard was inspected by the police every three to six months, he continued to operate the business. Given the long duration of comprehensive Michigan regulation of that business, defendant cannot claim any reasonable expectation of privacy regarding the search involved here. [*Id*. at 47.]

See, also, *Gora*, 456 Mich at 716 ("When a person chooses to engage in a 'pervasively regulated business . . . he does so with the knowledge that his business . . . will be subject to effective inspection.' ") (citation omitted) and *Beydoun*, 283 Mich App at 335 ("We conclude that defendant impliedly consented to warrantless searches as a condition of his participation in the tobacco business because Michigan has comprehensively regulated tobacco for decades, defendant had substantial familiarity with the tobacco licensing process and other tobacco regulations, and the plain and unambiguous language of the TPTA authorized the department and its agents to review tobacco-related documentation and inspect tobacco products.").

In sum, each of the seven *Tallman* factors supports the conclusion that the vehicle repair industry is a pervasively regulated industry, and that the warrantless search of Gratiot Collision survives constitutional scrutiny as an exception to the warrant requirements of the state and federal constitutions, US Const, Am IV; Const 1963, art 1, § 11. See *Tallman*, 421 Mich at 631 ("Because warrantless searches in these circumstances [pervasively regulated industries] are not 'unreasonable,' fishers who accept a commercial fishing license are not required to do so on the condition that they waive their constitutional right to be free from unreasonable searches.") and *Beydoun*, 283 Mich App at 335-336 (holding that because the tobacco industry fell "within the parameters of the pervasively regulated industry exception to the warrant requirement," the search and seizure did not violate either the federal or state constitution warrant requirements).

Although we conclude that a warrantless search was permitted as an exception to the warrant requirement for pervasively regulated businesses, the search actually engaged in must still have been reasonable. See *Burger*, 482 US at 702; *Donovan*, 452 US at 598; *Bruce v Beary*, 498 F3d 1232, 1248 (CA 11, 2007) ("Under certain limited circumstances, the Constitution permits warrantless administrative searches. It never permits unreasonable ones."), and *Club Retro, LLC v Hilton*, 568 F3d 181, 198 (CA 5, 2008) ("And, in all cases, the Fourth Amendment's

reasonableness requirement applies to government officials conducting administrative inspections of private commercial property."). In other words, even though the statutory scheme allows for reasonable warrantless searches, a court must still review what actually occurred to ensure the search was reasonable.[12] We conclude that it was.

Defendants argue (and the dissent agrees) that the suppression order must be affirmed because the search of the gated lot was unreasonable as it went beyond what was allowed by statute. There are several reasons why we cannot adopt this argument. First, in addressing this constitutional argument, the facts courts look to in determining whether an administrative search of a pervasively regulated business was in fact unreasonably (and thus unconstitutionally) conducted are not present here. The number of officers involved was no more than five, they did not force their way into the building or the locked gated area, and they did not have weapons drawn. From all accounts, the interchange between the officers and defendants was respectful and nonconfrontational. No evidence suggested that this was, in reality, a police raid. See *ABCDE Operating, LLC v Detroit*, 254 F Supp 3d 931, 951, 954-955 (ED MI, 2017) (holding that an administrative search was reasonable in part because even though officers were armed as they entered the premises, there was no show of force as in *Bruce* and *Club Retro, LLC*). There was no excessive showing or use of force by police while conducting this otherwise valid warrantless search.

Second, it is not constitutionally unreasonable for officers to inspect the VINs of vehicles on the premises when conducting a search of a vehicle repair shop that admittedly has no complying documents for the officers to review. To say, as defendants argue, that once there were no complying documents the search should have ended, would completely defeat the purpose of the act—to reduce the sale of stolen vehicles and their parts. See *Burger*, 482 US at 715-716 ("The regulatory purposes of § 415–a5 certainly are served by having the inspecting officers compare the records of a particular vehicle dismantler with vehicles and vehicle parts in the junkyard. The purposes of maintaining junkyards in the hands of legitimate businesspersons and of tracing vehicles that pass through these businesses, however, also are served by having the officers examine the operator's inventory even when the operator, for whatever reason, fails to produce the police book. Forbidding inspecting officers to examine the inventory in this situation would permit an illegitimate vehicle dismantler to thwart the purposes of the administrative scheme and would have the absurd result of subjecting his counterpart who maintained records to a more extensive search."). See also *Thomas Bros, Inc v Secretary of State*, 90 Mich App 179, 189; 282 NW2d 273 (1979) ("The regulation of the practice of servicing and repairing motor vehicles and the proscription of unfair and deceptive practices encompass the regulation of the sale of parts and goods in conjunction with repairs."). Importantly, the search of the vehicles located in the gated

---

[12] Again, our conclusion that the MVRSA satisfies the seven-factor *Tallman* test, which essentially encapsulates the three-part federal *Burger* test for reasonableness, establishes that the statutorily authorized administrative warrantless inspections fall within the pervasively regulated business exception and that when properly conducted pursuant to statute, are reasonable. We now address whether there were other circumstances occurring during the actual search conducted at Gratiot Collision that rendered it constitutionally unreasonable.

area (located on the premises) was directly related to ensuring compliance with the MVRSA, and was not used as a vehicle to uncover crimes unrelated to the vehicle repair business.

Third, although "the scope of the consent given extends only to reasonable inspections that are limited to that necessary to ensure compliance with the regulatory scheme," *Gora*, 456 Mich at 721, we agree with the prosecution that the trial court erred in interpreting MCL 257.1317(1) to limit inspections to only those locations where paper records and documents would reasonably be located, which the trial court ruled did not include the gated lot.

As noted, MCL 257.1317(1) authorizes that "the administrator and other law enforcement officials may make periodic unannounced inspections of the premises, parts records, and parts inventories of a facility." We first recognize that the way in which these three terms—premises, parts records, and parts inventories—are listed reflects that each term specifies a separate area or thing that can be searched. See *People v Allen*, 507 Mich 597, 607 n 16; 968 NW2d 532 (2021). Separately, none of these three terms are statutorily defined, so we must determine their plain meaning. The dictionary definition of the common word "premises" is "a tract of land with the buildings thereon" or "a building or part of a building usually with its appurtenances (as grounds)." *Merriam-Webster's Collegiate Dictionary* (11th ed 2014). The plain meaning of premises would, therefore, allow officers to search the buildings and adjacent grounds of Gratiot Collision.

Additionally, MCL 257.1317(1) not only allows unannounced inspections of the premises, but also of "parts records" and "parts inventories." "Parts records" clearly would encompass inspection of "reasonable business records," as defined in MCL 257.1318(2)(a)(*i-v*),[13] but "parts inventories" must have been intended to encompass something different than "parts records." See *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n* (*On Rehearing*), 484 Mich 1, 14; 795 NW2d 101 (2009) ("[w]hen the Legislature uses different words, the words are generally intended to connote different meanings"). "Inventory" has several common definitions. The one most relevant in this context is "the quantity of goods or material on hand," or "stock." *Merriam-Webster's Collegiate Dictionary* (11th ed 2014). Though there are other definitions that reference lists of goods or material, adopting those definitions would render "parts inventories" superfluous as it would then have the same meaning as "parts records." Under this definition, officers were permitted by statute to inspect the "goods or material on hand" within the premises of Gratiot Collision, so long as it was related to compliance with the MVSRA.[14]

To this same point, we note that nothing within MCL 257.1317(1) limits inspection of the "premises" to written records. Indeed, though MCL 257.1318 requires business owners to make available "reasonable business records" for inspectors, MCL 257.1317(1) does not limit (or even mention) inspections to only "reasonable business records." The legislature did not place a written

---

[13] MCL 257.1318 contains the required documents a facility must maintain and the appropriate time period for each category of document to be maintained. MCL 257.1317(1) through (5).

[14] This reading is consistent with that of the department of state, which publishes a manual regarding the MVRSA. In that manual, the department informs repair shop owners that "[a]ll unannounced inspections take place during reasonable business hours and will involve inspections of the premises and parts inventories of body shops."

-12-

records limitation on what can be looked for on the premises, and to judicially impose such a requirement would be both inconsistent with our limited judicial duty to simply enforce the language actually contained in the statute, and with other provisions of the act that require shop owners to maintain records on parts and vehicles on the premises. As just one example, the act requires shop owners to maintain records on distressed vehicles that are worked on or owned by the repair shop. MCL 257.1318(3). A "distressed vehicle" is defined in MCL 257.12a, and broadly speaking is a vehicle with damaged or missing parts that result in repair costs that come close to the market value of the vehicle before the damage occurred. Given this provision, it is certainly within the statutory authorization for officers to inspect vehicles or vehicle parts to either fill the void created by an owner who fails to provide the required records, or to determine the accuracy or completeness of records that are provided. Either way, inspecting VINs of vehicles located on the premises falls within the statutory authorization.

Finally, defendants argue that *Michigan v Clifford*, 464 US 287; 104 S Ct 641; 78 L Ed 2d 477 (1984) supports affirming the suppression order. They are wrong. For one thing, *Clifford* is a plurality decision, so is not precedent. See *United States v Pink*, 315 US 203, 216; 62 S Ct 552; 86 L Ed 796 (1942) ("While it was conclusive and binding upon the parties as respects that controversy, the lack of an agreement by a majority of the Court on the principles of law involved prevents it from being an authoritative determination for other cases") (citation omitted) and *CTS Corp v Dynamics Corp of America*, 481 US 69, 81; 107 S Ct 1637; 95 L Ed 2d 67 (1987). More importantly, *Clifford* specified that the *Donovan*, *Biswell* and *Colonnade* line of cases regarding warrantless searches of pervasively regulated businesses "are not applicable to the warrantless search in this case." *Clifford*, 464 US at 292 n 2.

For these reasons, the order of the circuit court suppressing the evidence obtained during the search conducted on the premises of Gratiot Collision is reversed, and the case is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Kathleen Jansen